IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD J. SESSO, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 20-1603 |
| | : | |
| v. | : | |
| | : | |
| EAGLEVILLE HOSPITAL, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

Smith, J.                                                                                                                                                              January 31, 2022

     Currently before the court is a physician's third attempt to state a plausible cause of action that a hospital unlawfully terminated his employment after he allegedly blew the whistle about certain patient safety issues at the hospital. The physician has filed claims under three separate causes of action: the Pennsylvania Whistleblower Law ("PWL"), the Federal False Claims Act ("FCA"), and Pennsylvania public policy wrongful discharge. The defendant hospital has asked the court to dismiss these claims because it asserts that the physician has failed to state any cognizable claim for relief.

     As with the physician's last amended complaint, he has failed to state a claim for relief in his new amended complaint. The court, however, is proceeding differently with respect to the ultimate result. In this regard, the physician has once again failed to assert a claim under the FCA insofar as he has not plausibly alleged that he engaged in "protected conduct" under the FCA. The court will dismiss this claim with prejudice because the court finds that allowing the physician a fourth attempt to assert a plausible FCA claim would be futile.

     In addition, as the FCA is the only federal claim asserted by the physician in this case, and as there is no other independent basis for jurisdiction over the PWL or the wrongful discharge

claims as the parties are not completely diverse for purposes of diversity jurisdiction, the court declines to exercise supplemental jurisdiction over these claims and will dismiss them without prejudice to the plaintiff to refile them in the appropriate state court.

## I.   ALLEGATIONS AND RELEVANT PROCEDURAL HISTORY

On March 25, 2020, the plaintiff, Donald J. Sesso ("Sesso"), commenced this action by filing a complaint against the defendant, Eagleville Hospital ("Eagleville"), in which he asserted causes of action under the False Claims Act, 31 U.S.C. §§ 3729–30 ("FCA") and the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421–28 ("PWL"). Doc. No. 1. Eagleville responded to the complaint by filing a motion to dismiss for failure to state a claim on June 9, 2020. Doc. No. 5. In response to the motion to dismiss, Sesso timely filed an amended complaint on June 22, 2020. Doc. No. 6. Eagleville then filed a motion to dismiss the amended complaint on July 6, 2020. Doc. No. 7.

The court granted the motion to dismiss the amended complaint on March 31, 2021. *See* Doc. No. 15. In dismissing the amended complaint, the court explained that the PWL provides that

> [n]o employer may discharge . . . an employee . . . because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer . . . an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.

Mar. 31, 2021 Order at 1 n.1 (quoting 43 P.S. § 1423(a)). The court determined that Sesso had failed to plausibly allege that Eagleville was a "public body" under the PWL. *See id.* In addition, the court concluded that Sesso had failed to plausibly allege that Eagleville was liable under the PWL for engaging in an instance of "waste" as defined in the statute. *See id.*

As for Sesso's FCA claim, he had generally claimed that Eagleville unlawfully retaliated against him after he had engaged in certain protected activity. *See id.* The court concluded that

Sesso failed to state a plausible FCA claim because he, *inter alia*, failed to plead with specificity any facts that connected his alleged protected activity and a federal *qui tam* action. *See id.*

Although the court dismissed Sesso's amended complaint, the court provided him with another opportunity to the extent that he could allege a plausible claim for relief. *See id.* Sesso timely filed a second amended complaint on April 9, 2021. Doc. No. 16. This second amended complaint once again included causes of action under the FCA and PWL and added a claim for a Pennsylvania public policy wrongful discharge. *See* 2d Am. Compl. at 1, 14–16, Doc. No. 16.

With regard to the allegations in the second amended complaint, Sesso alleges that he is a physician who started working for Eagleville in March 2010. *See id.* at ¶¶ 4, 10; *see also* Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss ("Resp.") at ECF p. 39, Doc. No. 18 (showing that Sesso signed Physician Employment Agreement with Eagleville in March 2010). Eagleville employed Sesso to "provide inpatient and non-hospital residential professional medical services and certain medico-administrative duties." 2d Am. Compl. at ¶ 9.

Eagleville "provides impatient and residential treatment for substance abuse, medical, psychological, psychiatric and co-occurring disorders and research, training and education services to professional and local communities." *Id.* at ¶ 6. It has approximately 300 patient beds, receives about 5,500 patient admissions per year, and provides about 97,000 treatment days per year. *See id.* at ¶ 7.

Sesso avers that Eagleville's 2018 Form 990 for Fiscal Year 2018 states the following about Eagleville's activities and revenues:

- It received $2,449,048, in government grants and contributions.

- It received $33,030,246 in program service revenue from Medicare and Medicaid.

- It received $2,004,727 in fees from government agencies.

3

- It received $119,511 from the Pennsylvania Department of Human Services for medical assistance.

- It received $82,713 in contributions from the Montgomery County Department of Health.

- It "supports professional education by hosting free or low cost conferences and seminars in collaboration with the Pennsylvania Certification Board, the Montgomery County Department of Behavioral Health and the Pennsylvania Department of Drug and Alcohol Program."

- It "is the host site for the Pennsylvania Certification Board's (PCB) Annual Training Series for the Delaware Valley Region. [It] is also the host site for the PCB's Certification Testing."

- It serves as a host agency for 20 trainings by the Montgomery County Department of Behavioral Health throughout the year.

- It hosted trainings by the Montgomery County Family Services Departments.

- It "annually conducts the state-mandated, 36 hour educational program on co-occurring core competency."

- It "provides space for Lower Providence Police Department to host their Drug Education Abuse and Prevention Program."

- It "employees three financial assistance counselors to ensure patients who are unemployed or working poor receive governmental assistance."

- It "has developed reciprocal relationships with Commonwealth agencies and centers of excellence to improve access to services for the heroin and synthetic opioid user."

- It "is cable of providing inpatient detoxification and rehabilitation as well as inpatient psychiatric care" for the older adult population.

- It "engages with outreach staff employed by county agencies for the purpose of teaching older medically isolated population, some of whom may need inpatient care at Eagleville."

- Its staff "have been involved in task forces and work groups at the invitation of the Pa. Dept. of Health Bureau of Drug and Alcohol Programs, the Pa. Dept. of Welfare Office of Mental Health and Substance Abuse Services, and the Pa. Commission on Crime and Delinquency."

- Its staff "has worked with the Montgomery County Suicide Prevention Work Group, the Montgomery County Forensic Work Group, the City of Philadelphia Forensic Task Force, the City of Philadelphia FIR/IPP Executive Committee and Montgomery and Delaware County Integrated Dual Diagnosis Work Groups."

- It "partners with the Montgomery County Office of Behavioral Health to offer ongoing training series to assist clinicians in their professional development."

- It is "count[ed] on" by the Single County Authorities in Pennsylvania insofar as it is one of the "very few remaining facilities [to] offer hospital level substance use disorder treatment."

- It provides the "only hospital level facility or integrated co-occurring facility" within several hours' drive" for some counties; thus, it is "a critical community resource."

- It is relied upon by the Single County Authorities to serve economically disadvantaged individuals and others who face chronic disabilities.

*Id.* at ¶ 8.

Sesso also points out that on October 23, 2019, the Montgomery County Industrial Development Authority approved Eagleville's request for financing of up to $20 million, through the issuance of revenue bonds for a development Eagleville was planning to expand its hospital campus. *See id.* at ¶ 33 and Exs. 6, 7. Eagleville's CEO acknowledged that this project would cost $50 million, and Eagleville took a loan out for $25 million of this amount. *See id.* at ¶ 33.

Sesso worked at Eagleville until January 2020. *See id.* at ¶ 10. For approximately the first six years of his time at Eagleville, Sesso worked five days per week and about 20–25 hours per week. *See id.* at ¶ 11. For the last approximately three years, he worked about 15 hours per week. *See id.* Eagleville paid Sesso by the hour, and by late 2019, he earned $90 per hour. *See id.*

Although Sesso only worked part-time hours, Eagleville's Scheduling Medical Staff Coordinator knew that he was available to work additional hours. *See id.* at ¶ 12. In addition, due to "frequent staffing and safety problems that arose when physician turnover occurred," this

5

Coordinator recognized the importance of keeping part-time physicians like Sesso on staff. *See id.* The Coordinator also represented to Sesso that Eagleville's CEO was aware of the need for part-time physicians and agreed that Sesso was "important and critical staff for Eagleville." *Id.*

According to Sesso, his limited hours were part of a larger problem in the hospital: During the last five years of his employment, there was "frequent turnover of full-time hospital physicians." *Id.* at ¶ 13. Nonetheless, Sesso and another part-time physician had agreed with the Coordinator that they would adjust their schedules to help accommodate when physician turnovers occurred. *See id.*

Eagleville's woes, however, did not stop with issues concerning physician turnovers. In March 2019, Eagleville's Medical Executive Committee (of which Sesso was not a member) submitted a letter to Eagleville complaining that "the careless and wasteful spending and hiring practices" were preventing physicians from providing adequate care to patients. *Id.* at ¶¶ 14–15. Sesso agreed with the Committee's letter to Eagleville. *See id.* at ¶ 15.

Eventually an FCA case named *United States of America, ex. rel. Christopher M. Smith v. Eagleville Hospital* was filed before this court and docketed at Civil Action No. 16-6627.[1] *See id.* at ¶ 16. The whistleblower in this case "alleged that Eagleville violated the FCA by submitting claims to Medicare, Medicaid, and the Federal Employees Health Benefits Program for hospital-level detoxification treatment services when the patients were ineligible for admission to receive such services or lacked documentation to support the claims." *Id.* The case ultimately settled in July 2019 for $2,850,000 in addition to a five year Corporate Integrity Agreement ("CIA")

---

[1] As will be explained in further detail below, Sesso listed this prior FCA action as related litigation in an effort to argue that there was "protected conduct" in this case.

requiring Eagleville to commit to a variety of best practices, including, *inter alia*, the appointment of a Chief Compliance Officer 90 days after the Effective Date on July 24, 2019.[2] *Id.*

Approximately a month after Eagleville's settlement, "there was a mass exodus of Eagleville physicians resigning from Eagleville." *Id.* at ¶ 17. A month later, on September 17, 2019, Sesso emailed the Director of Nursing, Director of Pharmacy, and a physician who just started working at Eagleville, to convey his concerns

> about the lack of rules and procedures, including a) medical personnel's awareness of risks of nsaids and noacs when platelets are low and that they should document reasoning when used, b) medical personnel's awareness that anti-convulsants like Keppra and Dilantin do not help withdrawal seizures but may be needed for coexistent epilepsy or if reasonable suspicion, c) minimizing phenobarbital use, d) do not order venous ammonia levels, and e) stipulate how many bowel movements are needed when using lactulose for Hepatic encephalopathy. Sesso also expressed concerns about AMA (against medical advice) discharge patients needing physician exam note or at least case review note of discussion with nurse, avoiding medication for outpatient narcotics or bzd's unless highly unusual circumstances are documented and be extra careful with bzd and insomnia meds during methadone taper.

*Id.* at ¶ 18.

Additionally, on October 1, 2019, Sesso emailed Eagleville's Chief Legal Officer, Sharmil McKee ("McKee"), noting that there were major changes in physician staffing and that he wanted to know (1) who the new "chair of staff" was, (2) the identities of those on the Medical Executive Committee, and (3) those responsible for "supervis[ing]" the "nurse practitioners and physician['s]

---

[2] The CIA is available at: https://oig.hhs.gov/fraud/cia/agreements/Eagleville_Hospital_07242019.pdf. Regarding the appointment of a Chief Compliance Officer, the CIA provided in relevant part as follows:

> Within 90 days after the Effective Date, Eagleville shall appoint a Compliance Officer and shall maintain a Compliance Officer for the term of the CIA. The Compliance Officer shall be an employee and a member of senior management of Eagleville, shall report directly to the Chief Executive Officer of Eagleville, and shall not be or be subordinate to the General Counsel or Chief Financial Officer or have any responsibilities that involve acting in any capacity as legal counsel or supervising legal counsel functions for Eagleville.

*See* CIA at 2; *see also* 2d Am. Compl. at ¶ 23.

assistants" on staff. *Id.* at ¶ 19. Sesso received a response from McKee stating that Eagleville's CEO would handle his request. *Id.* at ¶ 20. And surely enough, on October 1, 2019, Sesso received a response from Eagleville's CEO thanking him for "sharing [his] concerns with [Eagleville's] new Compliance Officer," implying that McKee was the Chief Compliance Officer in spite of the fact that her "email signature block as of October 1, 2019" stated that she was instead "Eagleville's Chief Legal Officer." *Id.* at ¶¶ 21–22. Sesso believes that McKee was not the Chief Compliance Officer.[3] *See id.* at ¶ 22.

Apparently, as of March 21, 2020, McKee was "represent[ing] herself to the outside world as Eagleville's Chief Compliance Officer." *Id.* at ¶ 24 and Ex. 2. Yet, by this date, McKee was not listed as part of the membership team at Eagleville and no Compliance Officer was listed as a member of the leadership team. *See id.* at ¶ 25 and Ex. 3. Sesso believes that Eagleville did not hire a Compliance Officer until April 2020. *See id.* at ¶ 26 and Exs. 4, 5.

Concerning Sesso's continued concerns with physician coverage and patient safety issues, he met with Eagleville's CEO in person on October 3, 2019. *Id.* at ¶ 27. Sesso informed the CEO that Eagleville needed more physician coverage and the lack of sufficient coverage created a patient safety issue. *See id.* In response to these concerns, Eagleville's CEO did not tell Sesso that Eagleville would change its staffing model. *See id.* at ¶ 28. Instead, the CEO spoke with Sesso about him teaching or taking on administrative duties in addition to working as a physician. *See id.*

Prior to his meeting with the CEO, Sesso had been scheduled to work 15 hours a week. Yet, after the meeting, Eagleville stopped scheduling him for work. *See id.* at ¶ 29. Sesso followed

---

[3] Per Sesso's interpretation of the CIA, "McKee could not have been Eagleville's Compliance Officer because she served in a legal counsel capacity and the CIA expressly prohibited the Compliance Officer from having any legal counsel responsibility." 2d Am. Compl. at ¶ 24.

8

up with the CEO and with a staff nurse, requesting more hours, but to no avail. *Id.* at ¶¶ 30–32, 34. The staff nurse did respond to Sesso by saying that another physician "has been covering both East and West and sometimes pts aren't dosed with Methadone until noon or after." *Id.* at ¶ 32. The staff nurse also indicated that she "[m]ay start writing incident reports as this is delay in pt. care." *Id.*

By October 29, 2019, Eagleville had still not scheduled Sesso to work any hours since he met with the CEO. *See id.* at ¶ 34. As such, he "decided to submit an anonymous complaint to the Joint Commission on Accreditation of Healthcare Organizations,"[4] complaining that (1) Eagleville was "operating at an unsafe level of care and supervision" due to the lack of physician staffing, (2) patients who were "suffering from narcotic withdrawal" were "delayed several hours before receiving methadone," (3) nurses were "upset and frustrated," and (4) the "lack of a medical governing body" and "certified additional officers" violated the Joint Commission's standards. *See id.* at ¶¶ 34, 35. Even though Sesso submitted his complaint to the Joint Commission anonymously, he believes that the CEO "knew or at least suspected" he submitted the complaint. *Id.* at ¶ 36.

In early November 2019 and early January 2020, Sesso received e-mails from Eagleville nurses who informed him that they were leaving the hospital. *See id.* at ¶¶ 37, 40. In early November 2019, he exchanged e-mail with a nurse practitioner, who indicated to him that she had submitted her resignation and was leaving Eagleville. *See id.* at ¶ 37. This nurse practitioner informed Sesso that, *inter alia*, she had "never worked for an organization like this" and "this place is unsafe." *Id.* Then, in early January 2020, Sesso received an e-mail from a staff nurse, who

---

[4] According to Sesso, the "Joint Commission seeks to continuously improve health care for the public, in collaboration with other stakeholders, by evaluating health care organizations and inspiring them to excel in providing safe and effective care of the highest quality and value." 2d Am. Compl. at ¶ 34.

indicated, *inter alia*, her belief that Sesso was not working because Eagleville did not "want to put out the money," and that one of the doctors was "overwhelmed with all the pts he is seeing." *Id.* at ¶ 40.

In addition, in early/mid November 2019, Eagleville's medical staff coordinator provided Sesso with documents to renew his employment agreement with Eagleville for another two years. *See id.* at ¶ 38. The medical staff coordinator informed Sesso that he should submit the documents, including the form for renewing his clinical privileges, to Eagleville by late December so its board could review the submissions by early January 2020. *See id.* Sesso timely submitted his information to renew his clinical privileges to Eagleville in late November 2019. *See id.* at ¶ 39.

On January 23, 2020, Sesso received a letter from Eagleville's CEO stating that Eagleville was terminating his employment without cause. *Id.* at ¶ 41. Although the CEO's letter purported to give Sesso 60 days' notice of the end of his employment, the CEO stated that "we do not anticipate having need for your services during this period." *Id.*

On February 14, 2020, Sesso allegedly received a letter from Eagleville's Vice President of Human Resources which acknowledged that he had complained about the following to McKee: (1) "Eagleville does not have a Medical Director or Medical Staff Committee Chair and theses [sic] vacancies may violated Eagleville's by-laws and state regulations;" and (2) "Eagleville has one physician caring for all hospital-level patients and this is insufficient to treat patients safely." *Id.* at ¶ 42. The Vice President of Human Resources also allegedly indicated that Sesso had reported these concerns to Eagleville's CEO and, in response to this complaint, Eagleville retaliated against Sesso and reduced his work schedule. *Id.*

After reviewing these allegations, Eagleville has again moved to dismiss, filing its motion regarding the second amended complaint on April 9, 2021. Doc. No. 17. Sesso filed a brief in

10

opposition to the motion on May 5, 2021. Doc. No. 18. Eagleville then filed a reply brief in further support of its motion on May 19, 2021. Doc. No. 19. The court held oral argument on the motion on June 4, 2021. The motion is ripe for disposition.

### III. DISCUSSION

#### A. Standard of Review

Rule 12(b)(6) allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests "the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). As the moving party, "[t]he defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

Rule 8(a)(2) of the Federal Rules of Civil Procedure establishes the basic standard for legal sufficiency of allegations in a complaint. *Stevenson v. Carroll*, 495 F.3d 62, 65 (3d Cir. 2007). Per this Rule, a complaint is legally sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "The touchstone of [this] pleading standard is plausibility." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Although Rule 8(a)(2) does "not require heightened fact pleading of specifics," it does require the recitation of "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Thus, to survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). This plausibility standard is "not akin to a 'probability requirement,' but it asks for more

than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 570). Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

### B. Analysis

#### 1. The FCA Claim

As Sesso acknowledges in his second amended complaint, his only federal claim in this case is his retaliation claim under the FCA (31 U.S.C. § 3730(h)). The court therefore first addresses the merits of this claim.

To allege a plausible FCA retaliation claim, Sesso must allege that he (1) was "engaged in protected conduct (i.e., acts done in furtherance of a[] [*qui tam*] action under § 3730)" and (2) that "the retaliation was motivated, at least in part, by [Sesso] engaging in that protected activity." *Davis v. Point Park Univ.*, No. 10-1157, 2010 WL 4929104, at *6, 8 (W.D. Pa. Nov. 30, 2010) (citation and internal quotation marks omitted). The second prong additionally requires that the employer was on "notice of the 'distinct possibility' of" FCA litigation and still "retaliated against the employee." *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 179 (3d Cir. 2001).

When this court granted Eagleville's motion to dismiss Sesso's amended complaint, the court found Sesso had "failed to satisfy the first prong," because he failed to plausibly allege that his complaints were "in furtherance of a *qui tam* action." Mar. 31, 2021 Order at 1 n.1 (citing *Davis*, 2010 WL 4929104, at *5). The court nonetheless provided Sesso with an opportunity to remediate this defect by allowing him to submit a second amended complaint which would plausibly allege a "nexus" between his activities and violations of specific "provisions" of the CIA and his previously cited *qui tam* action. *Id.* Unfortunately, Sesso has failed to capitalize on this opportunity.

12

There is not a single relevant section of the CIA explicitly cited in the second amended complaint. And to the extent Sesso has attempted to allege a nexus between Eagleville's last *qui tam* action, the facts alleged are vague. Sesso does allege he anonymously "complained to" the Joint Commission (a non-governmental body that inspects hospitals on behalf of the Pennsylvania Department of Health) that "Eagleville was operating at an unsafe level of care and supervision due to a majority of the physician staff quitting in dispute with the administration." 2d Am. Compl. at ¶¶ 34–35. But again, he fails to specify how such criticism would be in furtherance of a *qui tam* action.

Sesso tries to bolster his position by stating that he complained about (1) "patients . . . suffering from narcotic withdrawal[,] are delayed several hours before receiving methadone," (2) "nurses are upset and frustrated," and (3) the lack of a medical governing body and certified additional officers" are in violation of the Joint Commission's "standards." *Id.* at ¶ 35. But it remains unclear to the court *which standards* are violated by these conditions. Are these purportedly violated standards the sort that could lead to a *qui tam* suit? The court cannot discern this from the second amended complaint because Sesso has not provided the necessary details to allow for such a determination.

Moreover, Sesso admits that he submitted these complaints anonymously before Eagleville terminated his employment. *See* 2d Am. Compl. at ¶ 34. Although he "believes" that the Eagleville CEO knew or "suspected" he made the complaint to the Joint Commission, this still would not plausibly show that Eagleville could be considered on "notice of the 'distinct possibility'" of a resulting FCA action. *Id.* (describing Sesso as complaining to the Joint Commission only after "he had still not been scheduled to work any hours by Eagleville"). As such, Sesso's allegations in the second amended complaint also fail the second prong for a cognizable FCA retaliation claim.

13

"[T]he most specific allegation given" in the second amended complaint regarding potential *qui tam* litigation is the same as it was in the first amended complaint: It is the allegation that Eagleville "appointed its Chief Legal Officer as its Chief Compliance Officer," in violation of the CIA, and that Sesso knew this because he "had received an email" suggesting that McKee was Eagleville's new Chief Compliance Officer" ("CCO") when she was actually Eagleville's Chief Legal Officer ("CLO"). Mar. 31, 2021 Order at 1 n.1; *see also* 2d Am. Compl. at ¶¶ 19, 21. Yet, Sesso still does not allege that he actually *complained* about McKee's alleged simultaneous appointment to both positions. Even if he did, the email implying McKee was Eagleville's CCO was sent to Sesso before the CIA required Eagleville to appoint a CCO. *Compare* 2d Am. Compl. at ¶ 22 (alleging nothing about Sesso or his actions and, instead, simply stating that while his supervisor thought that "McKee was Eagleville's Compliance Officer," Sesso claimed that "she was not," given her "signature block as of **October 1, 2019**" which said "she was Eagleville's Chief Legal Officer" (emphasis added)), *with* 2d Am. Compl. at ¶ 23 (citing a portion of CIA requiring Eagleville Hospital to appoint a compliance officer "90 days after the Effective Date" on "July 24, 2019," which would be **October 22, 2019**—after Sesso's observation regarding McKee's signature line). As such, Sesso's observation that Eagleville's CCO and CLO were the same person is ineffectual as a relevant complaint of unlawful activity, because there was no complaint and it was not unlawful at the time.

Similarly, Sesso alleges that a March 2019 letter from Eagleville's Medical Committee complained about noncompliance with hospital bylaws and Eagleville's failure to hire a compliance officer in the time specified within the CIA. 2d Am. Compl. at ¶¶ 14, 24–26. But again, this new allegation does not establish a nexus between Eagleville's conduct and Sesso himself,

even if he agreed with the letter. That is to say, Sesso was not involved with that letter—he was not even in the group that sent the letter and he had no role in drafting it. *Id.* at ¶ 15.

Indeed, although Sesso is asserting a claim for unlawful retaliation under the FCA, he has not alleged to have observed or complained of any unlawful conduct under the FCA. Even the complaints that Sesso allegedly made to Eagleville's Director of Nursing, Director of Pharmacy, Chief Legal Officer, and CEO are in no way evident as being of the sort that could reasonably lead to a *qui tam* suit: they involve complaints of "lack of rules and procedures" pertaining to medical practices, 2d Am. Compl. at ¶ 18, rather than "fraud against the [United States] Government." Claire M. Sylvia, The False Claims Act: Fraud Against the Government § 1:1, WESTLAW (Apr. 2021) ("*FCA Note*").

While Sesso's complaints might indeed be concerning from the standpoint of best medical practices, they simply are not of the sort that the False Claims Act was designed to protect. *Compare* 2d Am. Compl. at ¶ 1 (describing the case as one in which "Plaintiff, Donald J. Sesso (Sesso), is suing his former employer, Defendant Eagleville Hospital (Eagleville), for terminating his employment in retaliation for him blowing the whistle about patient safety issues"), *with* Compl. at 1, *United States of America ex. rel. Smith v. Eagleville Hosp.*, No. 16-6627 (E.D. Pa.), ECF No. 1 (describing the case, later cited by Sesso as the relevant *qui tam* matter in this case, as involving "claims aris[ing] out of" [Eagleville's] knowing submission of false and fraudulent claims for payment to the United States Government").

The FCA "harness[es] the resources of private individuals to aid" the United States "Government in redressing fraud." *FCA Note* § 1:1. And the FCA only applies to fraud that "cause[s] or would cause economic loss" to the Federal government. *Hutchins*, 253 F.3d at 179. Even now, after having amended his complaint twice, Sesso is still unable to articulate how

15

anything he said or did related to the defrauding of the United States Government. He has been unable to allege that his complaints would have warned anyone about a potential breach of the CIA. And he has failed to allege or argue that his complaints about hospital procedure would be relevant to some other potential independent *qui tam* suit. Further, at oral argument, Sesso's counsel admitted that Sesso does not allege that Eagleville overbilled or that its practices led the Federal government to incur economic loss.

While Sesso does not need "a showing of fraud" to state "[a]n FCA-retaliation claim," he still must show that he engaged in "protected conduct" in furtherance of a civil action" in which he suspected or complained of economic fraud against the Government. *Elkharwily v. Mayo Holding Co.*, 955 F. Supp. 2d 988, 994 (D. Minn. 2013). Instead of doing so here, he has left the court and Eagleville to, once again, muddle through his allegations—wondering how they could possibly fit into his chosen cause of action. As it does not appear that there is a plausible FCA retaliation claim here, the court must dismiss this claim as well.

### 2. Leave to Amend FCA Claim

Based on the foregoing analysis, the court concludes that Sesso has once again failed to plausibly allege a cognizable claim for relief under the FCA. The court is cognizant that "if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) (citation omitted). However, Sesso is already on his second amended complaint, with the court having already allowed a curative amendment after dismissing his FCA claim. In addition, the second amended complaint suffers from the same general deficiencies as the first amended complaint. As such, the court finds that a third amended complaint would be futile.

Accordingly, the court will not provide Sesso with an opportunity to file a third amended complaint.

3.  **Supplemental Jurisdiction Over PWL and Pennsylvania Public Policy Wrongful Discharge Claims**

Sesso also asserts claims for a violation of the PWL and for Pennsylvania Public Policy Wrongful Discharge. Having dismissed with prejudice Sesso's only federal claim, the court will not exercise supplemental jurisdiction over any state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if-- . . . (3) the district court has dismissed all claims over which it has original jurisdiction . . . ."). As the Supreme Court instructs:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.

*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966). Here, the court finds no basis to retain supplemental jurisdiction of any state-law claims.

Additionally, there is no independent basis for subject-matter jurisdiction over any state-law claims. The only possible basis is under the diversity jurisdiction statute, 28 U.S.C. § 1332, which grants a district court subject-matter jurisdiction over a case in which "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a). Section 1332(a) requires "'complete diversity between all plaintiffs and all defendants,' even though only minimal diversity is constitutionally required. This means that, unless there is some other basis for jurisdiction, 'no plaintiff [may] be

a citizen of the same state as any defendant.'" *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 104 (3d Cir. 2015) (quoting *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005) and *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010) (internal footnotes omitted)). "The burden of establishing federal jurisdiction rests with the party asserting its existence." *Id.* at 105 (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006)).

For purposes of determining whether parties are completely diverse, an individual is a citizen of the state where the individual is domiciled, meaning the state where the individual is physically present and intends to remain. *See Washington v. Hovensa LLC*, 652 F.3d 340, 344 (3d Cir. 2011) ("[D]omicile is established by an objective physical presence in the state or territory coupled with a subjective intention to remain there indefinitely." (citation omitted)). "A corporation is a citizen both of the state where it is incorporated and of the state where it has its principal place of business . . . ." *Zambelli*, 592 F.3d at 419 (citations omitted). Here, Sesso alleges that he is a citizen of the Commonwealth of Pennsylvania. *See* 2d Am. Compl. at ¶ 4. He also alleges that Eagleville is a Pennsylvania citizen. *See id.* at ¶ 5. Therefore, the parties are not completely diverse for purposes of establishing this court's jurisdiction over Sesso's state-law claims.[5]

### IV. CONCLUSION

For the reasons above, Sesso has failed to assert plausible allegations that would state a cognizable claim under the FCA. The court declines to exercise supplemental jurisdiction over Sesso's state-law claims. Accordingly, the court will (1) grant Eagleville's motion to dismiss

---

[5] Alternatively, Sesso's allegations in the second amended complaint are insufficient to establish this court's diversity jurisdiction insofar as he identifies his residence instead of his domicile, and while he alleges that Eagleville is a Pennsylvania corporation, he does not identify its principal place of business (although it almost assuredly is also located in Pennsylvania).

Sesso's FCA claim and dismiss that claim with prejudice, and (2) dismiss without prejudice his PWL claim and his Pennsylvania public policy wrongful discharge claim.

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.